FILED & JUDGMENT ENTERED
Steven T. Salata

Jul 10 2012

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

In re:                                   )      Case No. 11-32738
                                         )      Chapter 7
**ADORA V. CASSEDAY,**                   )
                                         )
            Debtor.                      )
                                         )

**ORDER SUSTAINING TRUSTEE'S OBJECTION TO DEBTOR'S EXEMPTIONS**

Hearings were held on April 12 and April 18, 2012 on the Trustee's Objection to Debtor's Exemptions ("Objection"). At these hearings, Jeffrey I. Garis, Esq. appeared on behalf of the Debtor, and R. Keith Johnson, Esq. represented himself as Chapter 7 Trustee. Having considered and reviewed the pleadings, the record in this case, and the arguments of counsel, this Court finds and concludes as follows:

**FINDINGS OF FACT**

1. Adora V. Casseday ("Casseday" or "Debtor") is the Debtor in a voluntary Chapter 7 case filed on October 28, 2011.

2. R. Keith Johnson is the Chapter 7 Trustee for Casseday's bankruptcy estate (the "Trustee").

3. With her petition, Casseday filed the schedules and statements required under Fed. R. Bankr. P. 1007 (together, the "Bankruptcy Petition"). She verified that the information contained in these documents was true and correct per 28 U.S.C. § 1746.

4. As detailed below and notwithstanding her verification, within a week of the filing, Casseday was obliged to amend her Bankruptcy Petition to correct misstatements and disclose other financial information. Casseday has since amended her Bankruptcy

   Petition on four additional occasions to disclose additional assets and debts as well as
   to amend her exemptions. Amendments were filed on November 4, 2011; November
   9, 2011; December 9, 2011; December 12, 2011; and January 12, 2012.

5. The post November 4, 2011 amendments were not entirely voluntary. As the Trustee
   described at the hearing, Casseday's amendments were typically occasioned by the
   Trustee's discovery of undisclosed assets and transfers made by this debtor, before and
   during the bankruptcy case.

6. On January 6, 2012, and after Casseday's last amendment to her Bankruptcy Petition,
   the Trustee objected to the Debtor's exemption claims, as amended.[1] His objection
   took issue with (a) the basis for Casseday's exemption claims, (b) her asset valuations,
   and (c) her failure to provide financial information and documentation as requested.
   The Trustee's objection was broad, in that without the missing
   information/documentation and an accurate Bankruptcy Petition, he could not make
   more specific objections.

7. At the April 12, 2012 hearing, the Trustee described the difficulties he has experienced
   in obtaining documentation and complete, accurate information from Casseday. He
   further pointed out several examples of how Casseday had failed to file an accurate
   Bankruptcy Petition, even as amended. Due to these failures, even now not all details
   of the Debtor's finances are known. However, of what is currently known, it appears
   that the following has transpired.

8. In 2011, Casseday and her husband were in financial distress. They had begun to
   consider a bankruptcy filing. They had consulted with attorney Garis regarding their
   prospective petition. However, their plans to file were upset when Casseday's
   husband passed away, on July 20, 2011.

9. Casseday was the beneficiary of her late husband's life insurance policy. On August
   27, 2011, Casseday collected $16,416 in insurance proceeds from the insurer.

10. Two days later, on August 25, 2011, Casseday opened a bank account in her minor son
    Andre's name at Wells Fargo Bank, using approximately $5,350 of the proceeds.[2]

11. On August 31, 2011, or four days after receiving the insurance proceeds, Casseday
    spent approximately $3,000 to pay off the car loan on her Toyota.

---

[1] In addition to her original exemption claims made in Schedule C of the Bankruptcy Petition, Casseday amended her exemptions on November 9, December 9, and December 12, 2011. The second and third amendments were potentially ineffective *ab initio*. Under Local Rule 4003-1(b), exemption amendments made after the § 341 meeting (here, December 1, 2011) must be by motion, upon notice to the Trustee. These amendments were not sought in this manner. The case record does not reflect whether the Debtor announced these amendments at the § 341 meeting, which would have been appropriate under the Rule. Of course, even amendments made of right are subject to objection by parties in interest.

[2] Casseday offered no suggestions of any other source of funding for the transactions that follow, so they appear to have been funded by the insurance recovery.

12. One month later, on September 24, 2011, Casseday purchased a 2008 Nissan Altima for $22,971. Casseday traded in the Toyota on the Altima, receiving a $7,800 credit for her trade.

13. On October 11, 2011, Casseday used $7,026 to open a joint bank account at Wells Fargo in her name and that of her adult daughter, Constancia.

14. A couple of weeks later, on October 28, 2011, Casseday filed bankruptcy under Chapter 7. As described in greater detail below, Casseday's original Bankruptcy Petition makes no mention of the aforementioned assets and transfers. The original Bankruptcy Petition also failed to disclose other significant assets.

**The Insurance Policy Proceeds.**

15. In Schedule B, #9, a debtor is prompted to disclose ownership interests held in insurance policies. In the original bankruptcy petition, Casseday checked the block indicating, "None." Similarly, Sch. B, #20 asks for interests in a decedent's estate, death benefit plan, life insurance policy, or trust. Here too, Casseday checked the block, "None."

16. One might hypothesize that Casseday failed to list her beneficial interest in the insurance proceeds because by this point in time, she had already converted most of the proceeds into other assets. However, her Schedules also make no mention of any remaining monies (Sch. B., #1, 2) and receipt of the insurance proceeds is not disclosed in her Statement of Financial Affairs ("SFA"). SFA #2 asks for the debtor's non-employment income within 2 years of the petition.

17. Through five amendments to the Bankruptcy Petition, Casseday has yet to disclose the $16,416 of insurance proceeds that she collected two months before filing bankruptcy. These funds were only uncovered by the Trustee in his investigation of Casseday's affairs.

**The two 'custodial' accounts**.

18. As noted above, shortly prior to bankruptcy, Casseday used the bulk of the insurance proceeds to open what she terms "custodial" bank accounts for her two children.[3] Neither account is mentioned in Casseday's original Bankruptcy Petition. In fact, in that filing Casseday specifically disclaims the existence of any bank accounts. Schedule B, #2 requires a debtor to list her financial accounts. Here Casseday checked the box indicating, "None." Again, SFA #14, instructs the debtor to disclose all property owned by another person that the debtor holds or controls. Here, Casseday again stated, "None."

---

[3] These transfers appear likely to be avoidable as Section 548 fraudulent conveyances.

19. Similarly, the transfers that funded the two bank accounts were not disclosed in the original Bankruptcy Petition. In SFA #7 (Gifts or charitable contributions made within one year immediately preceding the commencement of this case), Casseday checked the block, "None."

20. It is true that Casseday voluntarily[4] disclosed these two bank accounts (and four others omitted from the original filing) in her first amendment to the Bankruptcy Petition dated November 14, 2011. *See* Schedule B, #3. However, even as she revealed the two 'custodial' accounts, Casseday misrepresented the source of their funding. In Amended Schedule B, Casseday stated that the two accounts derived from her deceased husband's estate, suggesting that these accounts were not her property. In truth, these accounts were funded from the insurance proceeds, meaning that they derived from the Debtor's property. This second false statement regarding the "custodial" accounts would not be corrected in Casseday's four subsequent amendments to the Bankruptcy Petition.

**Vehicles**.

21. Similarly, the original Bankruptcy Petition did not disclose all of Casseday's vehicles or her recent vehicle transactions. In her Schedules, Casseday listed a single vehicle, a 2004 Ford Expedition. *See* Schedule B, #25 (Automobiles).

22. In fact, at the petition date Casseday owned another vehicle, the recently acquired Altima. This car does not appear in Schedule B, #25 (Automobiles); nor is the car loan listed in Schedule D (Secured Claims). Finally, the Altima's car payment is not disclosed in Schedule J (Monthly Expenditures). Accordingly, Casseday's net income, from Schedules I & J, is inaccurately stated.

23. Casseday's payoff of the Toyota and her recent trade of that car for the Altima were transfers that should have been listed in SFA, # 3.a. (90 day payments to creditors) and SFA, #10.a. (Other transfers outside the ordinary course and within 2 years of the petition). However, in each instance, Casseday checked the block "None."

24. The Altima and the car loan would be revealed in Casseday's November 4 amendments to the Bankruptcy Petition, as Casseday sought to exempt the vehicle and reaffirm the car loan. However, even when correcting her petition to disclose the Altima, Casseday provided the Court with misleading information about the car. In the November 4 Amendments, Casseday indicates there is no equity in the Altima above the car loan ($13,375 value versus a $18,756 secured debt). In fact, Casseday had just purchased the vehicle one month earlier and via her trade, had $7,800 equity in the car.

25. Casseday would not disclose the car payment for that Altima in her original petition, the November 4 Amendments, or in the November 9 Amendments. This information

---

[4] "Voluntary" meaning, in this context, on her own and not in response to the Trustee uncovering the information.

was not revealed until her December 9 Amendments. The other omissions regarding Casseday's vehicle transactions have yet to be corrected in the Bankruptcy Petition.

**Casseday's Post-petition Payoff and Sale of the Ford Expedition.**

26. The one vehicle revealed by Casseday in her original Schedules was a 2004 Ford Expedition valued at $9,200 and said to be subject to a $3,500 lien. *See* Schedule B, #25 (Automobiles). Casseday did not attempt to exempt any part of the $5,700 equity in that vehicle. The vehicle and that value belonged to the bankruptcy estate.

27. Nevertheless, on November 1, 2011, or four days after filing bankruptcy, Casseday paid off the loan on the 2004 Ford Expedition using a portion of the insurance proceeds. A week later, Casseday sold the vehicle to a third party for $8,000.

28. Casseday did not inform the Trustee of these post-petition transfers. She did not seek court approval for either. She did not turnover the money received for the Expedition. She did not reveal these matters at the November 30 creditor's meeting. These matters are not disclosed in any amendment to her Bankruptcy Petition. The Trustee would not learn of these transactions until January 19, 2012.

29. Casseday's improper actions were compounded when, on November 9, 2011, the Debtor amended her bankruptcy schedules seeking to claim an exemption in the 2004 Expedition which she no longer owned. Even at this point in time, Casseday did not reveal the loan payoff or the sale of the vehicle.

**The Creditors Meeting.**

30. At the November 30, 2011 creditors meeting, the Trustee questioned Casseday about her finances and her Bankruptcy Petition. A standard question asked of debtors at these meetings is whether there are any changes or amendments to the Bankruptcy Petition. The previously described matters were not disclosed by Casseday to the Trustee.

31. During that meeting, the Trustee asked Casseday to provide him with a variety of financial documents. On December 9, 2011 she provided the Trustee with a portion of the requested documents. The detail in some of those records revealed the existence of the Altima, the bank accounts, a retirement account, and the insurance proceeds to the Trustee.

**The IRA & The December 9 Amendments.**

32. One other undisclosed asset that came to light from the source documents provided on December 9 was a $36,600 retirement account.

33. Also on December 9, 2011, the day that she provided documents to the Trustee, Casseday again amended her Bankruptcy Petition. Among other things, in this

amendment she finally lists the newly discovered 401(k) retirement account and insurance proceeds (Schedule B 2).  Casseday also attempted to amend Schedule C seeking to exempt the belatedly disclosed pension account.[5]

**The December 12, 2011 Amendments.**

34. On December 12, 2011, Casseday amended her schedules for the fourth time. The purpose of this amendment is not entirely clear but appears to be an effort to gather all her assundried exemption claims into a one motion that included the newly disclosed 401(k) retirement account.

**The January 12, 2012 Amendments.**

35. On January 12, 2012, Debtor amended her petition for the fifth time to reveal a pre-petition payment ($2,148) to her bankruptcy attorney. This payment was somehow overlooked by both the Debtor and her counsel in the first four versions of the Bankruptcy Petition. *See* Statement of Financial Affairs, #9.

**The Unscheduled Tax Refunds.**

36. Finally, on April 9, 2012, the Trustee received requested documentation from the Debtor concerning her 2011 state and federal income tax returns. No refunds were scheduled in the original bankruptcy petition or in the five amendments thereto. The information received by the Trustee revealed that Casseday was entitled to a state refund of $1,294 and a federal refund of $6,694.

37. The Trustee demanded that Casseday turn over these nonexempt assets.[6] As of the hearing date, Casseday had not done so; nor has she attempted to exempt them. Given this, it appears likely that these monies have been dissipated.

## Statement of Positions

The Trustee argues that Casseday has treated this bankruptcy case as a game of hide and seek.  He believes Casseday intentionally failed to disclose several material assets and asset transfers (including unauthorized post-petition transfers of estate property). Now, with her subterfuge revealed, Casseday brazenly suggests that she be allowed to amend her exemptions and keep the assets which she previously sought to hide.  The Trustee asks that the Debtor's exemption claims be denied, in toto.  He further advises that he intends to file an adversary proceeding seeking revocation of this Debtor's discharge for fraud.

---

[5] Exemptions do not become final until thirty (30) days after they are filed. *See* Fed. R. Bankr. P. 4003.  Further, under this Court's local rules, a change in exemptions sought after the § 341 creditors meeting must be sought by motion upon notice. *See* Local Rule 4003-1(b).  Casseday had attempted to amend her exemptions via amendments to Schedule C filed on Nov. 4, Nov. 9, Dec. 9 and Dec. 12. With this multiplicity of changes, none of Casseday's exemptions were final at the date the Trustee's objection was filed.

[6] Technically, the Trustee seeks 5/6's of the refunds, representing the pre-petition portion of the tax year.

Casseday argues that she has proceeded in good faith, but following her husband's death she had difficulty focusing on her Bankruptcy Petition. Admittedly, her original filing was not accurate. However, the Debtor maintains the Bankruptcy Petition was prepared upon the best information available to her at the time, and was amended as information became available to her.

**DISCUSSION**

The bankruptcy process is designed "to relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh." *In re Kestell*, 99 F.3d 146, 147 (4th Cir. 1996), quoting *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 554-55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915).

Practically, the bankruptcy system depends upon debtors voluntarily, completely and forthrightly disclosing their assets, liabilities and the particulars of their finances. To guide these disclosures, Section 521(1) requires a debtor to file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs[.] Bankruptcy Rule 4002(4) specifically requires the debtor to "cooperate with the trustee in the preparation of" the complete inventory of the debtor's property required by Rule 2015(a)(1). Fed. R. Bankr. P. 4002(4).

That which is required to be disclosed is also required to be described accurately. Petitions are filed under penalty of perjury. *See* 28 U.S.C. § 1746. "The debtors have a duty to truthfully answer questions presented in the various schedules and filings carefully, completely and accurately." *In re Famisaran*, 224 B.R. 886, 891 (Bankr. N.D. Ill. 1998) (citing numerous authorities).

"The debtor is imposed with a paramount duty to carefully consider all questions included in the Schedules and Statement and see that each is answered accurately and completely." *In re Kasal*, 217 B.R. 727, 734 (Bankr. E.D. Pa. 1998), aff'd, 223 B.R. 879 (E.D. Pa. 1998). *See also FDIC v. Sullivan* (*In re Sullivan*), 204 B.R. 919, 942 (Bankr. N.D. Tex. 1997); *Morton v. Dreyer* (*In re Dreyer*), 127 B.R. 587, 593–94 (Bankr. N.D. Tex. 1991).

As our Circuit has stated, "The right of debtors to a fresh start depends upon the honest and forthright invocation of the Code's protections…," "[a]ccuracy, honesty, and full disclosure are critical to the functioning of bankruptcy," and are "inherent in the bargain for the discharge." *Kestell* at 149, quoting *In re Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974). Clearly, preparation of the petition, with its detailed statements and schedules is not intended to be a "best guess" endeavor.

Due to the importance of accurate information, it is no surprise that the Code punishes debtors who attempt to misuse the bankruptcy process. Concealing one's assets in a bankruptcy case, giving a false oath in a petition, and appropriating estate assets can lead to loss of the discharge. *See § 727(d)*. Such actions are also crimes. *See* 18 U.S.C. 152, et. seq.

"[B]ankruptcy courts have traditionally drawn upon their powers of equity to prevent abuse of the bankruptcy process…." *Kestell* at 147 (quoting 2 L. King, Collier on Bankruptcy § 301.05[1], at 301-5 to 301-7 (1996)). Among these powers, the Fourth Circuit has expressly identified Code Section 105 as a tool to deal with fraud by debtors and with bad faith petitions. *See id*. at 149 (plain meaning of Section 105 is that "a court of bankruptcy has authority to issue any order necessary or appropriate to carry out the provisions of the bankruptcy code" (quoting *In re Walters*, 868 F.2d 665, 669 (4th Cir.1989))).

Clearly, this judicial authority to police bankruptcy cases includes the ability to deny a debtor's exemptions, or amendments to exemptions, upon a showing of bad faith. *See In re Hamlett*, 304 B.R. 737 (Bankr. M.D.N.C. 2003) (citing *In re Yonikus*, 996 F.2d 866 (7th Cir. 1993)); In re Clark, 274 B.R. 127 (Bankr. W.D. Pa. 2002). Bad faith in this context includes concealment of the asset sought to be exempted on the part of the debtor seeking to exempt a previously non-disclosed asset, or upon a showing of prejudice to creditors or other parties in interest.

In the present case, the Debtor's bad faith is not just evident but rampant.

First, while Casseday attested to the accuracy of her Bankruptcy Petition through her signature on the same, it was anything but accurate. The original petition failed to disclose numerous potential assets, including the insurance proceeds, the "custodial accounts," several other bank accounts, the 401(k) pension plan, the Toyota automobile and Casseday's recently purchased Altima. That filing also omitted several significant financial transactions, such as receipt of the insurance proceeds, opening of the custodial accounts, the pay off of the Toyota car loan, the trade in of that vehicle for the Altima, and the pre-petition payment to bankruptcy counsel.

Admittedly, a few of these errors were corrected in Casseday's November 4 Amendment to the Bankruptcy Petition. However, even then, as Casseday corrected earlier false statements, she made others. She discloses the 'custodial accounts' but misleads the reader as to the source of their funding (the insurance proceeds, not her husband's decedent's estate).

In this and the amendments to follow, Casseday continues to provide false information. For example, the November 4 amendments continue to falsely disclaim any pension funds, any payments to attorneys, or tax refunds.[7] Several transactions remain unreported to date, including the Toyota pay off and trade. The unauthorized post-petition sale of the Expedition, an unauthorized, post-petition transfer that occurred on November 1, is not mentioned in either the November 4 amendments, nor in the November 9 amendments.

Casseday would have the Court believe that she prepared the petition on the best available information and corrected it as additional information came to light. Her suggestion is not tenable. Obviously, having been a party to these transactions, which all occurred shortly before or shortly after bankruptcy, Casseday was knowledgeable of the same at the time she was

---

[7] We do not know when Casseday learned she was entitled to a tax refund. However, at this writing, she still has not amended her Schedules to list this non-exempt asset; nor has she turned the refund over to the Trustee.

preparing her Bankruptcy Petition, amending it, and testifying at her creditors meeting. Her statements (including omissions) were not just false, they were also knowingly false at the time she made them.

Casseday would portray herself as a victim, who upon losing her husband, did the best she could with the petition during a time of great personal confusion and loss. It is a sympathetic picture, but one entirely imagined.

First, there is no real evidence that Casseday suffered from mental confusion. The evidence shows just the opposite. Casseday claimed the insurance proceeds available to her, and with her bankruptcy filing looming, moved them out of harm's way. She opened accounts in her children's names, and cleverly misdirected the court as to the source of their funding, converted the insurance funds monies to less marketable forms (paying off car loans; purchasing a new, encumbered car) and omitted the cars and the transactions from her petition. She sold one asset after bankruptcy, and obviously being aware of its existence, kept it out of her petition and put the money in her pocket. These events were not occasioned by confusion, but from greed.

Certainly, Casseday disclosed some of the true facts in amendments to her Bankruptcy Petition. However, the sequence of events demonstrates that these amendments were not the product of a contrite heart or a newly refreshed memory. Rather, each was a selfish act.

The November 4 Amendments were made because Casseday wanted to exempt and to reaffirm the debt on her Altima. The subsequent amendments are made in response to the Trustee's discovery of assets and transfers. These amendments show Casseday in response to the Trustee's discoveries attempting to get ahead of him by first disclosing and then attempting to exempt the newly discovered property. It is clear from this pattern, that but for the Trustee's discovery of thee assets, Casseday would have never disclosed their existence.

In fact, the knowingly false statements in Casseday's Bankruptcy Petition continue past the Trustee's discoveries. For example, on December 12, 2011, Casseday attempted to exempt the Ford Expedition, a vehicle which she knew (having sold it the month before) that she no longer owned. That sale is still not disclosed in the Bankruptcy Petition. Nor is there any mention of the payoff and trade in of the Toyota. Casseday still has not scheduled her tax refunds.

The Court can sympathize with Casseday's loss of her husband. However, that loss (which occurred three months before the Debtor filed bankruptcy) cannot justify the unlawful actions undertaken by the Debtor in this case.

In this case the Debtor's bad faith is obvious. Casseday has exhibited a total disregard for her disclosure obligations and the rights of her creditors, as represented by the Trustee. She was, and still remains, much more interested in generosity to herself than in justice for her creditors. Her conduct has materially prejudiced the Trustee and the bankruptcy estate, by the loss of assets to the estate and second by the work made necessary of the Trustee in ascertaining her true financial condition and trying to set things right. Further costs will continue to accrue to the estate as the Trustee will be obliged to seek turnover of these assets; pursue an objection to

discharge; and potentially participate in a criminal proceeding to follow.  Such conduct cannot be rewarded.

   Consequently, Casseday will forfeit her exemptions. The Trustee's Objection is **SUSTAINED**; the Debtor's exemptions are **DENIED**.  Casseday is directed to **TURNOVER** to the Trustee, the material assets remaining in her possession and/or under her control, to specifically include the 2011 tax refunds.

   Admittedly, some of the property sought is not subject to turnover under Section 542. For example, Casseday's children are record holders of the monies in the joint bank accounts and are not parties to the present matter. An adversary proceeding will be required to reach them. So too with Casseday's discharge, for which the Trustee has already stated an intention to revoke by separate adversary proceeding.

   Finally, because it appears likely that Casseday has committed criminal acts in regard to this bankruptcy case, the same is referred to the U.S. Attorney for review under 28 U.S.C. § 586.

**SO ORDERED.**

**This Order has been signed electronically.**   **United States Bankruptcy Court**
**The Judge's signature and Court's seal**
**appear at the top of the Order.**